UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD STEVERS,

        Plaintiff,

                                            Civil No. 09-11743
                                            Hon. John Feikens

        v.

UNITED OF OMAHA LIFE INSURANCE CO.

        Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO REVERSE
DEFENDANT'S ARBITRARY AND CAPRICIOUS ERISA DETERMINATION [7] AND
GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [8]**

        Plaintiff Richard Stevers ("Stevers" or "Plaintiff") filed this action under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* At all times relevant to this

action, Stevers was employed by G-Tech Professional Staffing, Inc. ("G-Tech") as a Program

Manager. Through his employment with G-Tech, Stevers was an eligible employee, covered under

group Short Term Disability ("STD") and Long Term Disability ("LTD") Plans administered by

Defendant United of Omaha Life Insurance Company ("United"). Stevers contends that United

violated the LTD Plan by terminating his claim for LTD benefits, despite his continued disability.

Currently pending before the Court are United's Cross-Motion for Summary Judgment (Dkt. 8) and

Plaintiff's Motion to Reverse Defendant's Arbitrary and Capricious ERISA Determination and Grant

Long-Term Disability Benefits (Dkt. 7). The Court has reviewed the Motions, including the

complete administrative record and all responsive pleadings, and has determined that a hearing on

these matters is unnecessary.  *See* E.D. Mich. LR 7.1(e)(2).  The Court issues the following findings of fact and conclusions of law, and for the reasons stated below, Defendant's Motion is GRANTED and Plaintiff's Motion is DENIED.

## I.  STANDARD OF REVIEW FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

In *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), the Court of Appeals for the Sixth Circuit held that, in denial of benefits actions under ERISA, a district court should conduct a review based solely on the administrative record at the time of the final determination, and render findings of fact and conclusions of law accordingly.  150 F.3d at 618-19 (Gilman, J., concurring in part and setting out the judgment of the court of appeals regarding the appropriate standard).  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator. *Id*.

There being no due process or bias challenge to the administrator's decision, the Court will decide this matter under the guidelines set forth in *Wilkins* by rendering findings of fact and conclusions of law based solely on the administrative record. *See Eriksen v. Metro. Life Ins. Co.*, 39 F. Supp. 2d 864 (E.D. Mich. 1999).

## II.  FINDINGS OF FACT

### A.      The Disability Plans

At all relevant times, Stevers worked as a Program Manager for G-Tech.  During his employment, he was covered by G-Tech's STD and LTD Plans, which were provided through and administered by United.

The Plans grant to United the "discretion and final authority to construe and interpret the policy":

> United has the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits within the terms of the policy as interpreted by United. In making any decision, United may rely on the accuracy and completeness of any information furnished by the Policyholder or an insured person. United's interpretation of the policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.

(Admin. Rec. at 7).

To claim a disability under the LTD Plan, an insured must provide "acceptable" proof of loss, including among other things, a written statement demonstrating that the insured is under the "Regular Care" of a physician, as well as any restrictions and limitations preventing the insured from performing his regular occupation. (*Id*. at 37). The LTD Plan defines <u>Regular Care</u> as the insured (a) visiting a physician "as frequently as is medically required, according to standard medical practice, to effectively manage and treat" his disabling condition; and (b) receiving "Appropriate Care and Treatment." (*Id*. at 54). <u>Appropriate Care and Treatment</u> is further defined as medical care and treatment that meets all of the following criteria:

> (a) It is received from a Physician whose expertise, medical training and clinical experience are suitable for treating [the insured's] Injury or Sickness;

> (b) It is Medically Necessary;

> (c) It is consistent in type, frequency and duration of treatment with relevant guidelines based on national medical research or published by health care organizations and government agencies;

> (d) It is consistent with the diagnosis of [the insured's] condition; and

> (e) Its purpose is to improve [the insured's] medical condition and thereby aid in [his] ability to return to work.

(*Id.* at 52).

Under the LTD Plan, <u>Disability and Disabled</u> is defined as "because of an Injury or Sickness, a significant change in [the insured's] mental or physical functional capacity has occurred in which [the insured] [is]:

(a) prevented from performing at least one of the Material Duties of [his] Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 80% of [his] Basic Monthly Earnings due to that same Injury or Sickness."

(*Id.*).

<u>Material Duties</u> means "the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. . . . One of the material duties of [an insured's Regular Occupation is the ability to work for an employer on a full-time basis."  And <u>Regular Occupation</u> means "the occupation [the insured] [is] routinely performing when [his] Disability begins."  (*Id.* at 53-54).

The LTD Plan explains that <u>benefits will end</u> under the plan on the earliest of: the day the insured is no longer Disabled under the Plan terms; the day the insured "fail[s] to provide [United] satisfactory proof of continuous Disability..."; or the day the insured is "not under Regular Care for the Injury or Sickness that caused the Disability."  (*Id.* at 33) (only relevant sub-sections included).

4

**B.  Plaintiff's Injury and Treatment**

Plaintiff is a fifty-nine year-old man.  He alleges that he was involved in an automobile accident on August 17, 2007, in  which his then-stopped vehicle was rear ended by another vehicle traveling in excess of 50 miles per hour.  (Admin. Rec. at 168-70).  He did not lose consciousness, nor was he taken to a hospital after the collision.  (*Id*.).  Plaintiff states that he hit the back of his head on the headrest, and the inside of his left knee on an unspecified object.  (*Id*. at 169).  There was no blood or bruising in the accident.  (*Id*.).

On August 20, 2007, Plaintiff first sought treatment for injuries allegedly arising from the accident with Glenn Caudell, D.C., of Caudell Chiropractic.  (*Id*. at 168-70).  He presented with complaints of constant sharp pain in the neck, mid-back, and low-back, with radiation to the right leg and both arms. (*Id*. at 165, 171).  He rated his pain at 3-4 on a scale of 0-10, with 10 being the worst pain.  (*Id*. at 165)  Despite his pain, Plaintiff indicated that he was "able to continue work." (*Id*. at 167).  He denied having been in any previous auto accidents.  (*Id*. at 170).  Plaintiff expressed interest in symptomatic pain relief, but no interest in correction of his underlying problem or development of a health maintenance plan.  (*Id*. at 165).  He treated with Dr. Caudell a total of nine times, reporting limited improvement after each adjustment, which lasted only a short time.  (*Id*. at 173-75).  Plaintiff's last chiropractic treatment was on September 14, 2007.  (*Id*. at 175).  On September 26, 2007, he informed Dr. Caudell that his doctor had ordered an MRI, given Plaintiff medication, and told him to discontinue all care until the MRI results were available. (*Id*.).  Plaintiff never returned to Dr. Caudell for additional treatment.  *Id*.

From September 19, 2007 to May 7, 2008, Plaintiff saw Tariq M. Awan, D.O., who lists his treatment specialties as "Family Medicine, Manual Medicine, Sports Medicine, and Pain Management." (*Id*. at 180-203).  On each of his eleven visits with Dr. Awan,[1] Plaintiff complained

of various combinations of neck and hip pain, with pain radiating to his shoulders, hands, knees, feet, and toes. (*Id.*). His pain ratings varied from 3 to 7 on a scale of 10 (with 10 being the worst pain). (*Id.*). Dr. Awan's examinations of Plaintiff revealed "no acute distress," but resulted in various diagnosis, including disc herniations, left hip labral tear, cervical and lumbar radiculopathy, and CD myofascitis. Dr. Awan relied on MRIs dated September 28, 2007 of the cervical and lumbar spine, and electro diagnostic studies from October 2007, as evidence of the herniations and radiculopathies. A December 11, 2007 MRI of Plaintiff's left hip also revealed a labral tear with cyst. (*Id.* at 189, 208). On each visit, Dr. Awan prescribed physical therapy and various pain medications. (*Id.* at 180-203).

During his first visit to Dr. Awan, Plaintiff stated that chiropractic treatment was not helpful. (*Id.* at 202). He never returned for additional chiropractic care, but began physical therapy sometime after October 4, 2007.[2] (*Id.* at 200). On November 21, 2007, despite Plaintiff's complaint that physical therapy was "hurting him a little," he requested (and received) a new physical therapy script. (*Id.* at 193). By early 2008, Plaintiff reported that physical therapy was helping and his pain was not as intense. (*Id.* at 187, 185) (January 9, 2008, February 7, 2008). By February, Plaintiff had also joined the YMCA and began doing pool exercises. (*Id.* at 185). His condition appears to have continued to improve, and on April 10, 2008, he reported that "he has fewer muscles aching." (*Id.* at 181). On that visit, the notes primarily reflect Plaintiff's concern about a month-long cough and runny nose. (*Id.*). Finally, at Plaintiff's May 7, 2008 "check up," Dr. Awan renewed Plaintiff's physical therapy script, and noted Plaintiff would "[f]ollow up when needed." Except for an

---

[1]Plaintiff originally visited Dr. Awan on average twice each month. Beginning in January 2008, the frequency of his visits decreased to just one per month.

[2]Dr. Awan had, in fact, prescribed physical therapy with Plaintiff's first visit on September 19, 2007. (*Id.* at 203). It is unclear why Plaintiff delayed this treatment.

6

unremarkable (and unrelated) chest CT scan on May 8, 2008, the Administrative Record is devoid of evidence of Plaintiff having any appointments, with <u>any</u> provider, after May 7, 2008.  (*See id.* at 209).

## C.  Plaintiff's Short-Term and Long-Term Disability Claims

### 1.  Plaintiff Was Initially Approved for Short-Term, Then Long-Term Disability Benefits

After the alleged automobile accident on August 17, 2007, Plaintiff continued working until October 31, 2007.  (*Id.* at 193).  There is nothing in the records suggesting that Dr. Awan found Plaintiff to be disabled from performing sedentary work before October 31, 2007.  Instead, the first reference to restrictions preventing Plaintiff from working are found in Plaintiff's Application for STD benefits, dated November 12, 2007. (*Id.* at 374-79).  In that application, despite Plaintiff having worked for 2½ months after the accident, Dr. Awan indicated that Plaintiff was totally disabled <u>from the date of the accident</u>, and would be incapacitated "until further notice."  (*Id.*).  And although Plaintiff had ceased chiropractic treatments two months earlier, Dr. Awan indicated that Plaintiff would require physical therapy 3 times each week and chiropractic treatments 2-3 times each week for an "undetermined" duration.  (*Id.*).

On December 19, 2007, United's case management nurse, Jan Sigerson, reviewed Plaintiff's medical records, apparently limited to the notes from several visits to Dr. Awan.  The records did not include an automobile accident report, MRI reports, or EMG reports.  From this preliminary review, Nurse Sigerson noted that Plaintiff "would be restricted from any type of lifting, bending, squatting, stooping, crawling, prolonged standing or sitting, he should not work with neck extended, no overhead lifting or reaching."  (*Id.* at 391).  Nurse Sigerson, however, added,

> Will need copies of any MRI or x-ray reports on [Plaintiff], also the MRI report
> when completed on hip and follow up visit progress notes.  Notes from physician
> [sic] therapy would also determine [Plaintiff's] current level of functioning.

(*Id.*).  Nurse Sigerson concluded that Plaintiff's medical condition supported "consideration of disability through next physician visit."  (*Id.*).

By letter dated December 20, 2007, United authorized Plaintiff's STD benefits through December 5, 2007.  (*Id.* at 363).  United explained that additional records would be required to continue coverage: "In order to properly review your claim to determine if any additional benefits can be allowed, please have your physician fax in any MRI's [sic], x-ray reports, and additional physical therapy notes that are beyond December 5, 2007."  (*Id.*).  Dr. Awan submitted another disability certification, dated January 14, 2008, indicating that Plaintiff remained totally incapacitated.  The treatment regimen was unchanged, and included medication, chiropractic care 2-3 times/week,[3] and physical therapy 2-3 times/week for 4-6 weeks. (*Id.* at 354-56).  On January 22, 2008 and January 24, 2008, United reminded Plaintiff that it needed MRI reports and physical therapy progress notes in order to continue his benefits.  (*Id.* at 352-53).  Plaintiff submitted his MRI reports on January 25, 2008, but provided no physical therapy notes.  (*Id.* at 348-50).

On February 4, 2008, Nurse Sigerson reviewed Plaintiff's supplemented medical records.  The nurse determined that "Mr. Stevers would not be able to sit or stand for extended periods.  He would not be able to lift, bend, stoop, squat, or perform any type of strenuous activities.  He would not be able to extend his neck or work above shoulder level."  (*Id.* at 395).  Nurse Sigerson concluded that Plaintiff's disability was supported, but added, "[i]t will be necessary to continue to

---

[3]Again, Dr. Awan had not prescribed chiropractic care, Plaintiff had stopped treating with a chiropractor before beginning treatment with Dr. Awan, and Plaintiff had specifically told Dr. Awan that chiropractic treatments were not helpful.

request progress notes . . . from all treating practitioners including the physical therapy records to continue [to assess] [Plaintiff's] level of functioning and plan of care." (*Id*.). That same day, United informed Plaintiff that he had been approved to receive the maximum STD benefits, through January 31, 2008. (*Id*. at 333, 396). Plaintiff indicated at that time that he was continuing physical therapy, but may require surgery down the road. (*Id*.).

Having exhausted his STD benefits, Plaintiff applied for LTD benefits on February 7, 2008. (*Id*. at 324-27). United approved his application on February 13, 2008. (*Id*. at 311). In that same letter, however, United informed Plaintiff that he was "required to submit continual proof of loss during the duration of [his] claim." (*Id*.) (emphasis added). Such proof may include "supplemental claim forms . . . and medical records." (*Id*.).

On April 17, 2008 and May 8, 2008, United requested from Dr. Awan "copies of the patient's clinical office notes, laboratory test results, x-ray results, or results of other tests" since December 1, 2007. The letters also requested "any physical therapy notes that you may have, or the contact information for Mr. Stevers's physical therapist." (*Id*. at 282-85, 301-03). On or about May 14, 2008, Dr. Awan re-submitted his office notes, but did not provide any additional information regarding Plaintiff's physical therapy treatments. (*Id*. at 279).

### 2. *Plaintiff's Long-Term Disability Benefits Were Terminated*

On June 6, 2008, Nurse Sigerson completed a follow-up review of all medical records. (*Id*. at 273-74). She noted that Dr. Awan had not addressed Plaintiff's restrictions and limitations in his notes dated February 7, 2008, March 6, 2008, or April 10, 2008.[4] (*Id*.). And although Plaintiff continued to attend physical therapy, there was no documentation of the frequency or effectiveness of his visits. Nurse Sigerson also considered that Plaintiff had infrequent visits with his physician,

---

[4] Dr. Awan's records from the May 7, 2008 visit had not yet been submitted to United.

9

there were no physical therapy records available, there were no updated MRIs or x-rays confirming his condition, and no functional capacity evaluation had been completed.  Thus, although Nurse Sigerson previously had recommended approving Plaintiff's disability through February 2008, she concluded that *"[b]eyond the visit 2-7-08 there is no indication of a functional incapacity of physically completing a job that requires no heavy lifting or strenuous activity."*  (*Id.*).

That same day, United informed Plaintiff that because the records received did not support the definition of Disability and Disabled, his claim for benefits <u>beyond April 29, 2008</u> had been denied. United further explained that missing records may support his claim:

> We have not received the following information: Complete physical therapy records; an updated MRI report or X-ray report; and a functional capacity evaluation.  In order to provide your claim with a full and fair review, it is essential for you to provide this documentation with your letter of appeal.

(*Id.* at 276).  Plaintiff appealed on June 23, 2008.  (*Id.* at 271).

### 3.  *Plaintiff's Appeal of United's Denial of Ongoing Long-Term Disability Benefits*

By letter dated June 27, 2008, United requested that Plaintiff provide the following for consideration during its review of its denial of benefits determination:

    (a)    physical therapy records;

    (b)    chiropractic records;

    (c)    a copy of the August 17, 2007 accident report;

    (d)    emergency room visits and/or hospital admission/discharge summaries;

    (e)    Dr. Awan's records since April 11, 2008;

    (f)    clarification of Dr. Awan's physical examination findings;[5]

---

[5]United further explained, "[Dr. Awan] notes that Mr. Stevers has tenderness to palpatation over the SI gluteal, positive Stinchfield test and pain with external and internal rotation.  However, he does not mention straight leg raises, range of motion, flexibility, muscle strength, reflexes, sensory, gait/station, etc." (*Id.* at 266).

10

(g)     medical records from all other treating medical professionals (i.e. Primary Care Physician, Orthopaedic specialist/surgeons, Neurologist/Neurosurgeons, etc.) beginning on November 1, 2007;

(h)     any test results (including MRIs and x-rays, EMGs, etc.) since December 12, 2007; and

(i)     a Physical Capacities Checklist, with supporting medical records.

(*Id*. at 266-67).  All supplemental records were to be provided to United by July 28, 2008.  (*Id*.).

In response, on July 14, 2008, Plaintiff provided only items: (b) Dr. Caudell's chiropractic records from August 20, 2007 to September 14, 2007 (*Id*. at 161-76); (e) Dr. Awan's records through the May 7, 2008 consultation and the May 8, 2008 chest CT (*Id*. at 177-210); and (g) records of Ralph W. Raper, M.D., with whom Plaintiff treated from around May 11, 2001 to around June 28, 2007[6] (*Id*. at 211-65).   On August 8, 2008, United received item (i), the Physical Capacities Checklist, dated July 29, 2008.  (*Id*. at 141-43).  The Physical Capacities Checklist, for which supporting medical records were not provided as requested, listed among its many limitations that Plaintiff could stand or sit no longer than 30 minutes at a time, could sit no more than 4 hours in an 8 hour day, and could do no repetitive movements with his hands, arms, legs or feet. (*Id*.).  Finally, on August 28, 2008, an unsigned, undated disability certificate was faxed to United from the Allen Park Health Center (at which Dr. Awan and others practice), reflecting Plaintiff's diagnosis as "L-S/cervical myofascitis, fatigue, hip labral tears", and listing a work disability from August 26, 2008 through September 26, 2008.  (*Id*. at 140).  Again, no supporting records were provided, nor is there any indication in the record that any physician at that office saw Plaintiff after May 7, 2008 to assess his then-current functional restrictions.

---

[6]These records are not actually responsive to request (g), as they were from a period *before* Plaintiff's purported August 17, 2007 automobile accident.

Despite United's specific request to Plaintiff on at least five occasions (December 20, 2007, January 22, 2008, January 24, 2008, June 6, 2008, and June 27, 2008), and requests to Dr. Awan on at least two occasions (April 17, 2008 and May 8, 2008), Plaintiff never provided any physical therapy records that would reveal his functional capacity and treatment progress after February 7, 2008.  Nor did Plaintiff submit the following requested information: the August 17, 2007 accident report; records of tests (MRIs, x-rays, EMGs, etc.) after December 2007; records from any medical treatment after May 7, 2007; or further clarification of Dr. Awan's physical findings.

### a.    <u>Plaintiff's Prior Medical Conditions/Records</u>

In support of his appeal, Plaintiff submitted medical records from treatment with Dr. Raper, with whom he treated from May 11, 2001 through June 28, 2007.  (*Id*. at 212-265).  Because the LTD Plan defines Disability as <u>a significant change</u> in condition <u>caused by an Injury or Sickness</u>, a number of prior conditions referenced in Dr. Raper's records appear relevant:

1) In May 2001, Plaintiff complained of <u>pain under arms, radiating down both arms</u> for the previous 8 months.  (*Id*. at 223).

2) In June 2001, Plaintiff complained of <u>pain in both shoulders</u>; x-rays produced normal results.  (*Id*. at 226-27).

3) In June 2001, Plaintiff complained of <u>upper back pain</u>.  An exercise-stress test related to this pain was discontinued "due to <u>hip and knee pain</u>."  (*Id*. at 229).

4) Around April 8, 2003, Plaintiff complained of <u>low back pain, radiating to his legs</u>.  (*Id*. at 218).  On this visit, Dr. Raper's assessment listed <u>degenerative disc disease</u>.

5) In April 2003, Plaintiff sought a second opinion from Dr. Frank Chan, for "pelvic discomfort."  During his consultation with Dr. Chan, Plaintiff "admitted to having been involved in an auto/pedestrian accident about three years ago," in which he "<u>sustained some hip as well as back injury</u>."  (*Id.* at 250).[7]

---

[7]This record directly contradicts Plaintiff's statement to Dr. Caudell that he had no previous accidents. (*See id.* at 170).

6)      In an undated letter, perhaps from 2003, Dr. Raper's office sent a letter on Plaintiff's behalf to the Wayne County Jury Commission, indicating that Plaintiff was being treated for <u>degenerative disc disease</u>, and, as a result, "[j]ury duty would be taxing for him" at that time, and in the "foreseeable future." (*Id.* at 264).

### b.      United Denied Plaintiff's Appeal

On August 11, 2008, United's Senior Vice President and Medical Director, Thomas A. Reeder, M.D. reviewed all records on file, and provided his opinion as to Plaintiff's specific impairments, restrictions, and limitations. (*Id.* at 402-4). Dr. Reeder considered, among other things: (1) Plaintiff's prior medical history, including the previously-unreported auto accident with hip and back injury occurring in or around 2000; (2) Plaintiff's lack of improvement with chiropractic treatments; (3) the MRI's failure to report abnormal cord signal or nerve root contact; (4) Dr. Awan's boilerplate notes, changing diagnoses, and failure to document certain physical examinations (including a knee exam or detailed neurological exam) or other conditions (fatigue, B12 deficiency, erectile dysfunction); (5) Dr. Awan's failure to record specific restrictions and limitations with Plaintiff's disability certifications; (6) Plaintiff's failure to confirm the August 17, 2007 accident with an accident report, despite United's repeated requests; (7) the inconsistency between the reported speed of the collision (50+ m.p.h.) and Plaintiff's lack of loss of consciousness and urgent care; (8) Plaintiff's failure to seek any medical attention for 3 days following the accident; (9) inconsistencies between Dr. Caudell's functional observations of Plaintiff and the objective medical abnormalities as shown in MRIs; (10) Dr. Caudell's and Dr. Awan's failure to refer Plaintiff to a board certified orthopedist, neurologist or neurosurgeon; (11) MRI evidence suggesting the hip labral tear was an old injury; (12) Plaintiff's normal bilateral hip range of motion in the 2 months following the purported accident; (13) failure to document observations of decreased sensation or weakness in deltoids, shoulders, and biceps that would be expected with a significant

13

C5 radiculopathy; (14) symptoms of pain in both hips, legs, calves and numbness in toes appear "amplified" and there is "no consistent focal neurological abnormality." (*Id*.). Dr. Reeder concluded, in relevant part:

> - There is no physical exam or imaging evidence of an acute hip injury. The anterior superior labral tear with cyst formation most likely is old.

> - Symptoms, physical exam findings, imaging, and electrodiagnostic [sic] testing are not consistent with a focal neurological abnormality. The claimant reported symptoms in the hands, hips, knees, neck, shoulders, hands, toes and fingers. Dr. Awan's boilerplate notes fail to document a focal neurological deficit or consistent findings that support the presence of radiculopathy.

(*Id*.).

On September 8, 2008, United denied Plaintiff's appeal. (*Id*. at 132-37). United explained the applicable policy provisions and provided its rationale in detail. Specifically, United explained, "[t]he restrictions and limitations provided by [Plaintiff's] physician(s) must be supported by findings noted in the actual medical records and not based solely on the complaint of symptoms provided by the patient." (*Id*. at 133). United then summarized Plaintiff's relevant medical history, including his treatment with Dr. Caudell, Dr. Awan, and his test results (MRIs, EMGs, etc.). (*Id*. at 133-36). It noted, "[a]t no time in the medical records, is it noted that Mr. Stevers' [sic] was referred to an Orthopedist, Neurologist or Neurosurgeon. . . . The treatment has remained extremely conservative." (*Id*. at 137). It appears no assessment was performed to determine if Plaintiff would be a surgical candidate, or a candidate for epidural steroid injections. (*Id*.). In fact, "the last noted 'change' in findings was dated December 5, 2007, which would indicate that Dr. Awan either did not complete a physical examination or did not record the physical examination findings" after that date. (*Id*.). Finally, United explained Dr. Reeder's review findings, and concluded, "[i]n summary, the documentation fails to substantiate a condition or conditions that would have rendered Mr.

14

Stevers totally disabled and incapable [of] work." (*Id.*)

Having exhausted the administrative review process, Plaintiff now appeals United's denial of benefits to this Court. Plaintiff advances three arguments: (1) United failed to give deference to Plaintiff's treating physician, instead basing its decision to terminate benefits on a review by an internal medical reviewer who never physically examined Plaintiff; (2) the Physical Capacities Checklist submitted by Dr. Awan on August 8, 2008 demonstrates that Plaintiff is unable to do at least two material aspects of his job: "sitting for long periods of time and changing positions as needed"; and (3) United's internal review of February 4, 2008 is "utterly inconsistent" with its denial of LTD benefits "only four months later."

### III. FINDINGS OF LAW

### A.        The Arbitrary and Capricious Standard Applies

Denial of benefits under an ERISA plan by the plan administrator is reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the court reviews that administrator's determination for arbitrariness or caprice. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983-84 (6th Cir. 1991).

The parties here agree that the arbitrary and capricious standard of review applies to this matter. "The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (citation omitted). When applying this standard, the Court will uphold an administrative

15

action "if it is the result of a deliberate principled reasoning process, and if it is supported by

substantial evidence." *Id*. Stated differently, "when it is possible to offer a reasoned explanation,

based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id. See*

*also Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (citation omitted).

> However, this standard is not toothless. The Sixth Circuit has explained:

> While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald*, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues ." *Id.*

*Moon v. UNUM Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

> Accordingly, after fully reviewing the administrative record, and considering the quantity

and quality of the medical evidence and opinions on both sides, "[i]t is only if the court is confident

that the decision maker overlooked something important or seriously erred in appreciating the

significance of evidence that it may conclude that a decision was arbitrary and capricious." *Eriksen,*

39 F. Supp. 2d at 870 (citing *Wahlin v. Sears, Roebuck & Co.*, 78 F.3d 1232, 1235 (7th Cir. 1996)).

## B.  United Appropriately Relied Upon a Non-Treating Physician's Opinion

> In support of his argument that United's denial of benefits was unreasonable, Plaintiff objects

that United gave improper consideration to an internal medical review conducted by a physician who

"never physically examined the Plaintiff."  Docs. 7 at 6; 9 at 5.

> It is well established that a plan administrator need not defer to the opinions of treating

physicians.  In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Supreme

16

Court explicitly rejected a treating-physician rule:

> [W]e hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.  See also McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) ("Generally, when a plan administrator chooses to rely on the medical opinion of one doctor over that of another . . . the plan administrator's decision cannot be said to be arbitrary or capricious.").  And while the LTD Plan in this case gives the administrator discretion to order an independent medical examination, the administrator is not required to conduct a physical examination or hire an outside physician.  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("Although [the Plan] provision *allows* [the administrator] to commission a physical examination of a claimant, there is nothing in the plain language that expressly *bars* a file review by a physician in lieu of such a physical exam.") (emphasis in original).

Plaintiff acknowledges the holding of *Black & Decker*, but nevertheless urges the Court to adopt "a rule of common sense and equity" in weighing the opinions of Plaintiff's "long-term treating physician" against the opinions of Defendant's non-treating reviewers.  Dkt. 7 at 9-12.  In this case, Dr. Reeder's analysis demonstrates that he conducted a thorough review of Plaintiff's entire claims file.  He summarized all of Plaintiff's medical records, including Plaintiff's prior medical conditions, and noted numerous inconsistencies between Plaintiff's complaints, the objective evidence, and the extremely conservative treatment regimen. Dr. Reeder also considered the notable absence of documentation regarding (a) treatment after May 7, 2008; (b) physical therapy at any time; or (c) referrals to specialists who may have been able to resolve Plaintiff's ailments and return Plaintiff to work in his sedentary position.  Having conducted a thorough review

17

of the administrative record, I find no evidence that Dr. Reeder's file review was inadequate.

Moreover, a second reviewer, Nurse Sigerson, came to the same conclusions during a June 2008 review. Significantly, Nurse Sigerson originally recommended approving Plaintiff's application for short-term disability benefits, and later recommended extending Plaintiff's benefits so long as Plaintiff submitted ongoing proof of disability. It was only in June 2008, after Plaintiff ceased providing medical evidence of his disability, that Nurse Sigerson changed her recommendation.

Plaintiff characterizes Dr. Awan as a long-term treating physician, who has treated Plaintiff for "a number of years,"[8] and to whom the Court should afford special deference. *See* Dkt. 7 at 13. Dr. Awan, however, began treating Plaintiff approximately one month after the purported automobile accident. Plaintiff continued to work for 1 ½ months after he began treating with Dr. Awan, and there is nothing in the medical records to indicate a significant change in Plaintiff's condition at the time he stopped working. Additionally, Dr. Awan's boilerplate notes failed to reveal careful analysis of Plaintiff's progress, physical condition, functional limitations or restrictions, or treatment plan at each visit. In fact, as noted above, Dr. Awan continued to report to United that Plaintiff's treatment included chiropractic care 2-3 times per week, although Plaintiff had stopped seeing his chiropractor before beginning care with Dr. Awan. And finally – as Plaintiff simply ignores – there is no evidence that Plaintiff treated with Dr. Awan, or any other treating physician, after May 7, 2008. The July 2008 Physical Capacities Checklist is conclusory: it provides absolutely no evidence of a then-current physical examination or test results to support the broad, sweeping, and indefinite restrictions it imposes.

---

[8]According to the medical records, Dr. Awan saw Plaintiff a total of 11 times over a period of approximately 8 months.

Accordingly, I do not accept Plaintiff's invitation to ignore the Supreme Court's holding in *Black & Decker* and give special deference to Dr. Awan's restrictions. United's decision to rely on its internal reviewers was not arbitrary or capricious. *See McDonald*, 347 F.3d at 169.

## C. United Reasonably Requested Objective Evidence of Plaintiff's Disability

Plaintiff complains that Dr. Awan's Physical Capacities Checklist, submitted on August 8, 2008, establishes Plaintiff's disability from his regular occupation because he is unable to sit for long periods of time or change positions as needed. Dkt. 7 at 5-6. United gave little consideration to this checklist as it was not supported by <u>current objective evidence</u> justifying the broad-based restrictions.

The Sixth Circuit has held that a disability benefits plan may require a claimant to provide objective evidence of disability. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007) (citing *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)) ("Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."). As in this case, the definition of "disability" at issue in *Cooper* required that a claimant prove inability to perform "the material duties of his or her Regular Occupation." *Id.* at 159-60. The Sixth Circuit reasoned that objective documentation of the claimant's functional capacity could assist an administrator in determining whether the claimant was capable of performing the material duties of his position. *Id.* at 166.

Plaintiff repeatedly professes that he has provided United with "evidence of continuing disability, and [a] current objective medical evaluation from his treating doctor." Dkt. 7 at 2.[9] He

---

[9]Plaintiff claims that he "provided all necessary documentation to support a finding of disability." Dkt. 7 at 4. Plaintiff also asserts, without citation to the record, that (a) Dr. Awan's medical findings have not changed since 2007; (b) Plaintiff continues physical therapy treatments with no improvement; and (c) Plaintiff continues to have neck, back, and hip pain. *Id.*

cites MRIs from September 2007 and December 2007, and EMGs from October 2007.  Based on those tests, United originally <u>granted</u> Plaintiff's application for disability benefits.  United, however, requested <u>updated</u> testing to demonstrate Plaintiff's <u>ongoing</u> disability beyond April 29, 2008. United also requested that Dr. Awan further clarify his physical examination notes; Dr. Awan never did.  The record contains neither objective tests, nor detailed physical examination findings beyond April 29, 2008.  In fact, to evidence treatment beyond December, 2007, Plaintiff has provided *only* Dr. Awan's boilerplate notes through May 7, 2008, primarily listing Plaintiff's symptomatic complaints.

As in *Cooper*, United could reasonably interpret the Plan's language to require objective evidence of Plaintiff's disability.  In light of the complete lack of objective evidence of Plaintiff's <u>ongoing</u> disability, this Court finds that United's denial of disability benefits after April 29, 2008 was a reasonable exercise of its discretion.

## D.  The "Inconsistencies" in United's Actions Do Not Demonstrate Arbitrariness or Caprice

Plaintiff also claims that United's actions and notes reveal essential inconsistencies, suggesting that the administrator's decision to terminate Plaintiff's benefits was arbitrary and capricious.  Dkt. 7. at 6.  Specifically, Plaintiff quotes a partial paragraph from United's internal review by Nurse Sigerson on February 4, 2008.  That review, however, was based on the then-available medical records, including recent MRI and EMG reports.  That review <u>also</u> indicated that Plaintiff would need to submit ongoing proof of functional capacity, including physical therapy

---

As mentioned above, however, the administrative record is devoid of medical records relevant to Plaintiff's disability past May 7, 2008.  As such, Plaintiff's ongoing symptoms, undocumented physical therapy treatments, and Dr. Awan's current medical opinion is irrelevant to this Court's evaluation of the administrative record.  *See Wilkins*, 150 F.3d at 618-19.

progress notes.  Four months later, noting the <u>complete absence</u> of the requested physical therapy records or updated test results, Plaintiff's infrequent visits with his physician, and the lack of a current functional capacity evaluation, <u>the same reviewer</u> found that "beyond the visit 2-7-08, there is no indication of a functional incapacity of physically completing a job that requires no heavy lifting or strenuous activity."

I fail to see any inconsistency in United's determinations.  It authorized benefits during the period when Plaintiff supported his disability with objective test findings, and terminated benefits when Plaintiff stopped submitting proof of ongoing functional limitations.  The treatment notes from early 2008 suggest that Plaintiff was "on the mend"– reporting success with physical therapy and reductions in pain, and focusing on unrelated ailments including a cough, runny nose, fatigue, and erectile dysfunction.  Moreover, as Dr. Reeder correctly noted, Plaintiff was undergoing an extremely conservative treatment plan consisting almost exclusively of physical therapy,[10] which, according to Plaintiff's briefing in this case, is not working.  Dkt. 7 at 4 ("Plaintiff continues physical therapy treatments with no improvement.").  Plaintiff has not seen an orthopedist, neurologist, or neurosurgeon, nor has he been evaluated as a surgical candidate or for epidural steroid injections.  The LTD Plan's definitions of Regular Care and Appropriate Care and Treatment require that Plaintiff visit a physician as frequently as is medically necessary to "effectively manage and treat" his disabling condition, with a purpose to "improve [the claimant's] medical condition, and thereby aid in [his] ability to return to work."  Moreover, the LTD Plan entitles United to stop paying benefits at the earliest of: the day Plaintiff is <u>no longer Disabled</u> under the plan, the day he

---

[10]In fact, United can only assume that Plaintiff was treating with a physical therapist.  He has submitted no records from his therapy, leaving United (and this Court) unable to evaluate the frequency or effectiveness of any such treatment.

fails to provide <u>satisfactory proof of continuous Disability</u>, or the day Plaintiff is <u>no longer under</u> <u>Regular Care for his condition</u>. *See* Admin. Rec. at 33. As discussed above, the medical records in Administrative Record stop at May 7, 2008, and Plaintiff provided no objective test results after December 2007. Accordingly, United could have ceased Plaintiff's benefits because he was no longer providing proof of Regular Care, or continuous Disability. Under these circumstances, United's termination of Plaintiff's benefits is not inconsistent, arbitrary, or capricious.

## E. United's Denial of Benefits is Not Arbitrary or Capricious

Applying the foregoing authorities to the facts of this case, the Court finds that United's decision to deny Plaintiff's claim after April 29, 2008 was not arbitrary or capricious. The record clearly establishes that United did not overlook any evidence or err in appreciating the significance of the evidence presented to it. *Eriksen*, 39 F. Supp. 2d at 870. While it appears that United relied heavily upon reviews by Nurse Sigerson and Dr. Reeder, the evidence is clear that both reviewers and the claims administrator conducted a thorough review of all medical records and other documentation in the administrative record. The documentation failed to provide sufficient evidence to support Dr. Awan's recommendation that Plaintiff <u>continue to be</u> totally and permanently disabled from working, based solely upon Plaintiff's reports of pain.

Moreover, as Dr. Reeder noted, there is some evidence in Plaintiff's prior medical records to suggest that Plaintiff's condition is not the result of a new Sickness or Injury, as required by the LTD Plan, but rather stems from a prior accident or injury from approximately 2000. Plaintiff had complained of neck, back, and hip pain at least in 2001 and 2003, as reflected in Dr. Raper's notes. Plaintiff continued working for over two and a half months after the purported August 17, 2007 auto accident, and Plaintiff never produced a report from that accident, despite numerous requests.

In summary, there is no objective evidence of record to support Dr. Awan's recommendation to totally and permanently disable Plaintiff beyond April 28, 2008.  In fact, the evidence suggests that Plaintiff had stopped treatment by May 7, 2008.  Therefore, United's decision to terminate Plaintiff's claim was reasoned and supported by substantial evidence.  This Court finds the denial of benefits was not arbitrary or capricious.

Accordingly, Defendant's Cross-Motion for Summary Judgment is GRANTED, and Plaintiff's Motion to Reverse Defendant's Arbitrary and Capricious ERISA Determination and Grant Long-Term Disability Benefits is DENIED.

**IT IS SO ORDERED.**

Date:   January 4, 2010                        s/ John Feikens
                                               John Feikens
                                               United States District Judge


| Proof of Service |
| --- |
| I hereby certify that the foregoing order was served on the attorneys/parties of record on January 4, 2010, by U.S. first class mail or electronic means. |
| s/Carol Cohron |
| Case Manager |

23